

# In the
# Court of Appeals
# Second Appellate District of Texas
# at Fort Worth

───────────────────────

No. 02-18-00342-CR
No. 02-18-00343-CR
No. 02-18-00344-CR
No. 02-18-00345-CR
No. 02-18-00346-CR
No. 02-18-00347-CR

───────────────────────

MIGUEL DWAYNE HOBDY, Appellant

V.

THE STATE OF TEXAS

On Appeal from the 213th District Court
Tarrant County, Texas
Trial Court Nos. 1496357D, 1496501D, 1496502D, 1496597D, 1496599D, 1496603D

Before Sudderth, C.J.; Bassel and Womack, JJ.
Memorandum Opinion by Justice Womack

## MEMORANDUM OPINION

### I. INTRODUCTION

Appellant Miquel Dwayne Hobdy appeals his[1] six convictions for aggravated robbery with a deadly weapon (a firearm) stemming from five robberies committed in Arlington and Fort Worth on February 13 and 14, 2017. In one issue, Hobdy argues that the evidence is insufficient to support his convictions. Specifically, Hobdy argues that the evidence is insufficient to establish that he was the perpetrator of the robberies. Because we hold that there is sufficient evidence to support the jury's determination that Hobdy was the perpetrator, we will affirm.

### II. BACKGROUND

After obtaining an arrest warrant for Hobdy, Fort Worth police located Hobdy in Louisiana. He was then extradited back to Fort Worth where the State charged Hobdy with six counts of aggravated robbery with a deadly weapon.

At trial, Brenda Velasquez testified that she was working as a sales associate for MetroPCS on the evening of February 13, 2017. As she assisted a customer, a person with "a purple wig [wearing] bright colors" came into the store. Velasquez said that the person was looking around the store nervously, clenching his jacket tightly "as if it was cold." After the customer that Velasquez was assisting left, the person in the

---

[1]At trial, Hobdy testified that he considers himself to be a "transgendered female." In his brief, Hobdy states that he prefers to be referred to through the use of female pronouns, although many of the witnesses at trial referred to the perpetrator as a man dressed like a woman. In the opinion, we will use the generic pronouns "he," "him," "himself," and "his" to avoid confusion.

"purple wig" came to the counter and asked to purchase a phone charger. As Velasquez reached for a charger, she noticed that the person "pulled out [a] gun from underneath his armpit." As the robber held the gun close to himself while pointing it at Velasquez, the robber said, "Give me the money." In shock by what was happening, Velasquez said that she initially did nothing. The robber then said to her, "Give me the money, or I'll shoot you." Velasquez said that she then opened the register and handed the robber the money. Because Velasquez had counted the store's money and deposited it in the safe a few minutes earlier, she gave less than $60 to the robber.

From there, the robber motioned with his gun for Velasquez to move to the back of the store as he said, "Walk to the back." As the two proceeded back, the robber noticed a bank bag with cash in it. As he gathered the cash with one hand, he pointed the gun toward Velasquez with the other and told her not to move or he would shoot her. The robber then threatened Velasquez again and told her not to open the door to the back as he slammed it shut and left. After observing the robber leave the store via video monitors, Velasquez found her cellphone and called 911.

The State introduced and published for the jury audio of Velasquez's 911 call. In the call, Velasquez described how she had just been robbed by a "guy [who] had a gun, wearing a purple wig, purple leggings, [and] purple lipstick." Velasquez also said, "He was dressed like a girl." Velasquez went on to describe the robber as a black male, who was roughly six feet tall, had a mustache, and had "some kind of tattoo on

3

his neck." Later in the call, Velasquez described the tattoo as being on "both sides" of the robber's neck, but she also said that she could not make out what the tattoo was because the wig the robber was wearing covered it.

During Velasquez's testimony, the State introduced and published for the jury video captured from the in-store cameras that night. At the beginning of the video, a person who appears to be a black male, wearing a black and purple wig, leggings, and purple to pink lipstick, entered the store. Through the reflection in the window, the man can be seen walking around as Velasquez assists another customer. A few minutes later and as another customer entered the store, the robber jogged toward the store's door and then swiftly jogged away once he got outside. The State also replayed a portion of the video for the jury in which the robber can be seen coming into the store and looking almost directly toward the camera.

Velasquez said that as police investigated the robbery, she was asked to view a photo lineup. According to Velasquez, she identified the person who robbed the store from the photo lineup. After re-identifying the photo of Hobdy she had chosen from the lineup, Velasquez also identified Hobdy in court as the person who robbed the MetroPCS on February 13, 2017.

On cross-examination, Velasquez testified that when she initially saw the photo lineup, she wrote a comment on the front page of the photo packet that she was "almost sure [that] this is the person. Same eye look, same lips, same thing on the

4

right side, like a scar." Velasquez testified that she picked Hobdy from the photo lineup three days after the robbery and while her memory was still fresh.

The defense introduced and published for the jury a recording of Velasquez's interview with police. In the interview, Velasquez described the robbery. She also described the robber as having spoken in a deep, manly voice. Velasquez told the interviewing officers that the robber had tattoos on both sides of his neck but that the tattoos were hard to see because of the robber's wig and hoodie. She further described the robber as having a slight mustache and some type of "mole or scar" on his right cheek. She also said that the robber had dark skin, but "not dark, dark skin." While Velasquez was reviewing the photo array, she stated that one of the pictures "may" be the robber. She then asked to see two of the pictures side by side and then each of the pictures individually again. Eventually, Velasquez settled on a photograph and stated, "This could be him." One of the officers then asked, "So this could be him?" Velasquez replied that she was getting "goosebumps" looking at the photograph. She then said that although she was not 100% sure that it was the robber, the person in the photograph looked a lot like the robber "in the lips" and "on the right side," referring to the mole or scar on the person's face in the photograph. A little later in the recording, Velasquez told another officer that what really drew her to the photograph that she chose were the lips because she had focused on the robber's lipstick and lips while being robbed. She also told the second officer that when she saw the picture, she got scared.

5

After the recording was played for the jury, defense counsel asked Velasquez how many times she had said that she was not sure that the person in the photograph was the robber, to which Velazquez replied, "A lot." On re-direct, Velasquez admitted that she was five feet and one inch tall, and although she had reported that the robber was six feet tall, she testified that the robber was "taller" than her. While Velasquez was still on the stand, the State asked the trial court to take judicial notice of any tattoos that Hobdy had on his neck. The trial court took notice that Hobdy had tattoos on the back of his neck, not on the sides of his neck, and one on the back of his right hand. The State then had Velasquez use a laser pointer to indicate what stood out about the picture from the rest of the photographs in the array, and Velasquez pointed to Hobdy's eyes and lips, as well as the mark on his right cheek.

Charles Friend testified that he was working at GameStop on February 14, 2017, when he encountered who he initially thought was a female customer because the person was wearing a purple and black wig, had either bright pink or purple lipstick on, and wore tight-fitting leggings. Friend said that he quickly realized that the person was male because of the size of his feet. Friend approached the customer and asked if he needed assistance, but according to Friend, the customer acted as though he did not want to interact. Friend also thought that the person was acting "defensive about the way [the person was] clenching [his] jacket closed." Bothered by the customer's conduct, Friend went behind the counter and pressed the store's

6

security button, which notified the store's security company to actively monitor the store through the in-store cameras.

According to Friend, at about the same time he pressed the security button, the customer walked up to the counter, drew a handgun from beneath his jacket, and demanded the money from the cash registers and safe. From there, Friend and his coworker went about emptying all cash from the store's three cash registers and placing the cash in a store bag. Friend told the robber that he had entered the code into the safe but that it would not open until a ten-minute safety period had elapsed. While waiting for the safe to open, the store's security company asked over the intercom whether everything was okay, to which Friend and his co-worker said that it was. Seemingly bothered by the intercom announcement, the robber took the bag of money and left without waiting for the safe to open.

During Friend's testimony, the State introduced and published for the jury video of different angles of GameStop captured during the robbery. Using a laser pointer as he testified, Friend described the events on the video as they unfolded. The video corroborated much of Friend's testimony. The State also introduced and published for the jury audio of the store's security company's 911 call made just after the robbery. In the call, the person reporting the robbery described the robber as a black male dressed as a female wearing a black wig and printed leggings. The caller also reported that the robber had used a handgun during the robbery.

Three weeks after the robbery, officers asked Friend to view a photo lineup. He was unable to identify the robber from the lineup.

Jose Lazalde, Friend's coworker, testified that he also was working at GameStop the night of the robbery. According to Lazalde, as he was assisting a customer near closing time, he noticed a man come in wearing "bright purple lipstick, [a] purple wig[, and] really tight leggings." By Lazalde's account, after he finished assisting the customer and the customer exited the store, he turned around to begin cleaning up the store and saw the robber "showing a gun" to Friend. From there, the robber told both Lazalde and Friend that he had a gun, that it was loaded, and that he wanted all the money from the registers. Lazalde said that rather than pointing the gun directly at him, the robber kept "kind of hiding it . . . with his vinyl jacket, but it [remained] in his hand." Similar to Friend's testimony, Lazalde stated that he and Friend placed the money from the registers into a bag. Lazalde said that after he and Friend finished emptying out the registers, the robber said that he wanted the money from the safe. Because Friend was the only one who could enter the proper code to open the safe, Friend did so but only after explaining to the robber that the safe would not open for several minutes. Shortly after that, Lazalde said that the security company spoke over the store's intercom, checking on him and Friend. Lazalde said that as soon as he and Friend said that they were okay, the robber walked out of the store. Lazalde confirmed that several days after the robbery, police asked him to pick the robber from a photo lineup. According to Lazalde, even though he was not 100%

8

sure at the time he made his selection, he picked someone other than Hobdy out of the photo lineup.

Melina Ramos testified that she was working at a Cato department store located on South Fielder Road in Arlington on February 13, 2017, when she went to check on a coworker at the register who had called for her assistance. When she got to the register, Ramos saw a "guy dressed up as a female who pointed a gun at [her and her coworker] and asked for the money." Ramos described the robber as "wearing a jacket, a black and purple wig, pink lipstick, [a] crop top, and some leggings." Ramos said that the gun the robber used was a "silver and black . . . handgun." From there, Ramos said that she emptied both cash registers, put the money in a bag, and gave the bag to the robber. Ramos averred that after she informed the robber that the store's safe was empty, the robber ordered her and her coworker into a back room. According to Ramos, although the robber originally began to follow them to the back room, once they turned around, he was gone. While Ramos was on the stand, the State introduced and published for the jury video from the store's surveillance camera. Using a laser pointer, Ramos explained to the jury what they were watching on the video, which corroborated Ramos's testimony. In the video, the robber was wearing dark-colored pants.

Ramos said that a few minutes after the robber directed her and her coworker to the back room, she called 911. The State introduced and published for the jury an audio recording of Ramos's 911 call. In the call, Ramos described the robber as a

9

black male who was dressed like a woman wearing a black and purple wig and pink lipstick. She also described the robber as being six feet tall, very thin, and between twenty and thirty years old. Ramos said that the "handgun" the robber wielded was "gray and black." Also in the audio, Ramos told the operator that the robber was wearing white pants. After the audio played for the jury, Ramos continued to testify. Specifically, Ramos said that she had gotten the color of the robber's pants wrong in her 911 call because she was focused on the "top half" of the robber. A few days after the robbery, police asked Ramos to come to the police department to view a photo lineup. Ramos said that although she selected one of the people from the lineup, she had written that she did not know for sure if the person was the robber, "but he looked very similar." The photograph that she chose was of someone other than Hobdy.

Zane Fleming Phelps testified that she was also working at the Fielder Road Cato on the day the store was robbed. Phelps described the robber as a "dark-skinned" man who was "dressed like a female." Phelps said that the robber was wearing leggings and had on purple lipstick. According to Phelps, after the robber approached her at the register, he pulled out a gun and said, "Give me all the money in the register." Phelps said that she explained to the robber that she did not have the clearance to open the register, so she called Ramos from the back room to assist. The rest of Phelps's testimony about the robbery matched Ramos's testimony. Phelps also said that a short time after the robbery, detectives showed her a photo lineup, but she

was not able to recognize anyone. Phelps stated that the trauma of the robbery caused her to quit work the next day.

Arlington Police Department Officer Josh Altimus testified that he responded to 911's dispatch after Ramos called. By Altimus's account, the dispatch he received said that a black male wearing a purple wig and pink lipstick had just robbed the Fielder Road Cato at gunpoint. Upon arriving at the store and after speaking with Ramos and Phelps, Atlimus wrote in his report that the suspect was a black male with facial hair who was wearing flip-flops; multicolored, tight spandex pants; a purple crop-top shirt; a black hoodie with fur lining; and a black and purple wig. He also wrote in his report that Ramos and Phelps described the robber as approximately five feet and seven inches to five feet and ten inches tall, weighing between 130 and 150 pounds.

Allyson Salazar, who was working at a different Cato located on Little Road in Arlington on February 13, 2017, testified that she saw a man come into her store that night who was "oddly dressed." Specifically, Salazar said that the man "had girl[s] clothes on[;] a black jacket[; a] white shirt[;] purple, white, and black tights[; and] flip-flops." She also said that the man was wearing purple lipstick. By Salazar's account, she met the man at the register and then the man pulled out a gun, laid it on the counter, and said, "Open the register and [sic] the money in the safe." Salazar said that she put the money from both of her registers into a Cato bag and handed it to the robber. According to Salazar, neither her coworker nor any of the customers in

11

the store realized what had happened until after the robber was gone. Salazar called 911.

The State introduced and published for the jury Salazar's 911 call. In the call, Salazar told the 911 operator that her store had just been robbed and that the robber was a black male dressed like a woman wearing a purple and black wig; pink or purple lipstick; flip-flops; a black jacket; and purple, black, and blue tights. Salazar also described the robber as being roughly five feet and nine inches tall with a thin build, possibly weighing between 130 and 140 pounds, and appearing to be in his late twenties. Salazar also said that the robber had a little facial hair. She described the weapon the robber used as being a black and silver handgun.

Salazar admitted that she was unable to pick the robber out of a photo lineup that the police had showed her. She also said that she ended up quitting her job at Cato because the experience was traumatic. On cross-examination, Salazar testified that the robber was "very, very dark" and that the robber spoke in a quiet, low voice.

Officer Randy Collins of the Arlington Police Department testified that he responded to dispatch regarding Salazar's 911 call. Collins said that as he interviewed Salazar about the robbery, she clarified that the robber was wearing purple lipstick, not pink. He also stated that while he was on scene investigating, he heard about the robbery at the Fielder Road Cato and how that robbery involved someone that matched the description Salazar had reported.

12

Officer John Martin with the Fort Worth Police Department testified that he was working for the Saginaw Police Department on February 14, 2017, when he responded to a robbery call at a 7-Eleven. According to Martin, dispatch described the robber as a male dressed as a female. The dispatch also indicated that the robber had left the 7-Eleven in a black BMW. After arriving on scene, Martin spoke with the cashier, Edward Jefferson. Martin averred that either he or his partner wrote in the report that Jefferson described the robber as a black male dressed like a woman with a handgun who was roughly six feet tall wearing a black and purple wig, a black jacket, purple lipstick, and floral pants.

Jefferson also testified about the 7-Eleven robbery. Jefferson said that he was working as a cashier and stocker the night of February 14, 2017, when a man "dressed up as a female" came into the store wearing a black jacket, a wig, makeup, a woman's blouse, and multi-colored pants. He further described the wig as being black with "purplish like highlights in it." Jefferson also said that the robber was wearing pink or purple lipstick. By Jefferson's account, the robber came into the store acting "fidgety" and asked to purchase a package of cigars. When Jefferson went to ring up the cigars, the robber pulled out a handgun and demanded the money from the register. Jefferson complied and then the robber asked about the store's safe. When another employee informed the robber that employees did not have access to the safe, the robber demanded the money from a second register. According to Jefferson, after

13

he handed the robber a bag containing the money from both registers, the robber left the store, and Jefferson called 911.

While Jefferson was on the stand, the State introduced and published for the jury a recording of Jefferson's 911 call. In the call, Jefferson described how an armed black male "dressed up like a woman" had robbed the store. Jefferson described the robber's clothing as being a black jacket; a colorful blouse; and colorful, purple-like pants. He also reported that the robber was wearing purple makeup. During the call, Jefferson also said that there was a black BMW waiting outside while the robbery occurred, but he did not see the robber get into the car. Jefferson did state, however, that he believed the robber was associated with the vehicle because it left just as the robber did.

As Jefferson continued to testify, the State introduced and published to the jury pictures from the inside of the 7-Eleven. The State then had Jefferson describe the robbery using the pictures and a laser pointer as had Velasquez, Friend, and Ramos. The State also introduced and published to the jury a video taken from the store's surveillance camera showing the robbery as it occurred. As the video played for the jury, the State asked questions of Jefferson designed to allow him to narrate what was occurring in the video.

The day after the robbery, Jefferson picked Hobdy's photograph from a photo lineup as being the robber. Jefferson also identified Hobdy in open court as the person that he chose from the lineup and as the person who robbed the 7-Eleven.

14

Detective Bryan Kline from the Arlington Police Department testified that he led the investigation into the two Cato robberies. Kline said that after watching the surveillance video from one of the Cato stores, reviewing witnesses' statements, and listening to the 911 calls, he determined that he was looking for a twenty- to twenty-eight-year-old black male who was roughly five feet and nine inches tall and weighed about 130 pounds. He also said that the suspect had a thin build, possessed some slight facial hair, and used a silver handgun to commit the robberies. Kline further stated that all witnesses reported that the suspect was a male dressed as a woman wearing a black and purple wig, colorful lipstick, black and purple tights, and flip-flops. According to Kline, he did not initially have a suspect's name, so he published a bulletin to other police departments containing the suspect's description as well as a screen shot of the robber from one of the surveillance videos. After publishing the bulletin, a Fort Worth police officer contacted Kline and gave him Hobdy's name as a suspect related to the GameStop and 7-Eleven robberies. Kline averred that after conferring with another officer in his department regarding what that officer learned of the robberies, he decided to seek an arrest warrant for Hobdy.

Detective Harold Cussnick of the Fort Worth Police Department testified that he investigated the robberies of the 7-Eleven and GameStop that occurred on February 14, 2017. Cussnick said that after investigating the two robberies as well as gathering some information about the MetroPCS robbery, he determined that the same person had committed all of the robberies in similar fashion wearing the same

15

clothing. According to Cussnick, he eventually singled out Hobdy as the robber because more than one witness from the robberies had identified him in photo lineups. After seeing Kline's bulletin and believing that the robberies were related, Cussnick contacted Kline and shared his conclusion that Hobdy was the robber.

Cussnick said that he ultimately was able to locate Hobdy in New Orleans Parish, Louisiana, where he took Hobdy into custody. Cussnick also interviewed Hobdy in Louisiana about the robberies.

According to Cussnick, Hobdy denied any involvement in the robberies. Cussnick also said that he showed Hobdy Kline's bulletin and the thing that upset Hobdy more than being accused of the robberies was the description in the bulletin that the robber was "a man dressed as a woman." Cussnick said, "That one upset [Hobdy] extremely bad. [Hobdy] was more upset with that than he was being accused of robberies." According to Cussnick, Hobdy made inconsistent statements during the interview. Specifically, Cussnick testified that Hobdy initially said that he moved to Louisiana in 2015, but because it was 2017, he could not have lived in Louisiana for the "four years" he claimed he had lived there. Cussnick also said that his suspicion that Hobdy had not lived in Louisiana very long was buttressed by the fact that he had learned from Louisiana officials that Hobdy had obtained a Louisiana identification card on February 7, 2017. Cussnick said that he also found it unbelievable when Hobdy said that he had a phone during the times of the robberies but after only a month of owning the phone, he had thrown it away. The State introduced and

16

published for the jury audio of the interview, which verified Cussnick's testimony about what Hobdy had told him.

During Cussnick's testimony, the State introduced and published to the jury a map depicting the locations of the robberies and an address that Cussnick testified was associated with Hobdy. The map shows that the five robberies were all committed within a few miles of the address associated with Hobdy.

Hobdy testified in his own defense. Hobdy testified that he identifies as a "transgender female," that he began "transitioning" in 2014 through hormone therapy and "[s]eeing a therapist," that he plans on having a sexual reassignment surgery in the future, and that he was still in the process of "transitioning" during February 2017. Hobdy further averred that he considers himself a woman, that he presents himself as a woman "every day of [his] life," and that he gets upset if someone does not take viewing him as a woman seriously.

According to Hobdy, he was living in the streets of New Orleans during the time the robberies were committed and that he had lived in Louisiana since the middle of 2014. Hobdy admitted that he has a lengthy criminal history in Tarrant County, including convictions for aggravated assault, prostitution, and failure to identify himself to police, but he said that he had never been convicted of any offense that involved stealing from a person or carrying a gun. According to Hobdy, because of the hormone therapy, he has not been able to grow facial hair for a year and would not have been able to grow facial hair in February 2017. He also said that he had seen

17

the video footage from the surveillance cameras and that he could not see that the robber had facial hair. By Hobdy's account, he bears no resemblance to the robber in the videos. Specifically, Hobdy said that the person in the video is obviously a man disguised as a woman whereas he is already living as a woman. He also stated that his eyebrows are not as "heavy" as the robber's eyebrows and that he does not have the same-shaped nose as the robber.

On cross examination, Hobdy admitted that he was in Texas in 2014 when he was convicted of prostitution and served a six-month jail sentence. When asked why he had testified that he lived in New Orleans in 2014, he stated that he "got the years mixed up." When asked again whether he was in New Orleans in 2014, Hobdy did not respond. The State introduced and published to the jury pictures of Hobdy that officers took of him after he was extradited to Texas. Hobdy agreed that the pictures accurately reflected him at the time he was extradited, but he said that during that time he was not taking his routine hormones. He also testified that he had a pretty distinctive scar on the side of his mouth. On redirect, the defense introduced two photographs of Hobdy that had been taken the day of trial.

A jury convicted Hobdy of six counts of aggravated robbery with a deadly weapon and assessed punishment at sixty years' confinement for each conviction. The trial court rendered judgment accordingly, ordering that the sentences run concurrently. This appeal followed.

## III. Discussion

In his sole issue, Hobdy argues that the evidence is insufficient to support his convictions. Specifically, Hobdy argues that the evidence is insufficient to establish that he was the individual that committed the robberies. Hobdy does not challenge that the five robberies were committed by the same person.

Federal due process requires that the State prove beyond a reasonable doubt every element of the crime charged. *Jackson v. Virginia*, 443 U.S. 307, 316, 99 S. Ct. 2781, 2787 (1979); *see* U.S. Const. amend. XIV. In our due-process evidentiary-sufficiency review, we view all the evidence in the light most favorable to the verdict to determine whether any rational factfinder could have found the crime's essential elements beyond a reasonable doubt. *Jackson*, 443 U.S. at 319, 99 S. Ct. at 2789; *Queeman v. State*, 520 S.W.3d 616, 622 (Tex. Crim. App. 2017). This standard gives full play to the factfinder's responsibility to resolve conflicts in the testimony, to weigh the evidence, and to draw reasonable inferences from basic facts to ultimate facts. *See Jackson*, 443 U.S. at 319, 99 S. Ct. at 2789; *Queeman*, 520 S.W.3d at 622.

The factfinder alone judges the evidence's weight and credibility. *See* Tex. Code Crim. Proc. Ann. art. 38.04; *Queeman*, 520 S.W.3d at 622. Thus, when performing an evidentiary-sufficiency review, we may not re-evaluate the evidence's weight and credibility and substitute our judgment for the factfinder's. *Queeman*, 520 S.W.3d at 622. Instead, we determine whether the necessary inferences are reasonable based on the evidence's cumulative force when viewed in the light most favorable to the

19

verdict. *Murray v. State*, 457 S.W.3d 446, 448 (Tex. Crim. App. 2015); *see Villa v. State*, 514 S.W.3d 227, 232 (Tex. Crim. App. 2017) ("The court conducting a sufficiency review must not engage in a 'divide and conquer' strategy but must consider the cumulative force of all the evidence."). We must presume that the factfinder resolved any conflicting inferences in favor of the verdict, and we must defer to that resolution. *Murray*, 457 S.W.3d at 448–49.

To determine whether the State has met its *Jackson* burden to prove a defendant's guilt beyond a reasonable doubt, we compare the crime's elements as defined by the hypothetically correct jury charge to the evidence adduced at trial. *See Jenkins v. State*, 493 S.W.3d 583, 599 (Tex. Crim. App. 2016); *Crabtree v. State*, 389 S.W.3d 820, 824 (Tex. Crim. App. 2012) ("The essential elements of the crime are determined by state law."). Such a charge is one that accurately sets out the law, is authorized by the indictment, does not unnecessarily increase the State's burden of proof or restrict the State's theories of liability, and adequately describes the particular offense for which the defendant was tried. *Jenkins*, 493 S.W.3d at 599. The "law as authorized by the indictment" means the statutory elements of the charged offense as modified by the factual details and legal theories contained in the charging instrument. *See id.*; *see also Rabb v. State*, 434 S.W.3d 613, 616 (Tex. Crim. App. 2014) ("When the State pleads a specific element of a penal offense that has statutory alternatives for that element, the sufficiency of the evidence will be measured by the element that was actually pleaded, and not any alternative statutory elements.").

A person commits aggravated robbery if he commits robbery and he uses or exhibits a deadly weapon. Tex. Penal Code Ann. § 29.03(a)(2). A person commits robbery if, in the course of committing theft with the intent to obtain or maintain control of the property, he intentionally or knowingly threatens or places another in fear of imminent bodily injury or death. *Id.* at § 29.02(a)(2). A firearm is a deadly weapon. *Id.* at § 1.07(a)(17).

The State must prove beyond a reasonable doubt that the defendant is the person who committed the charged offenses. *Bradley v. State*, 359 S.W.3d 912, 916 (Tex. App.—Houston [14th Dist.] 2012, pet. ref'd). Identity may be proven by direct evidence, circumstantial evidence, or even reasonable inferences made from available evidence. *Gardner v. State*, 306 S.W.3d 274, 285 (Tex. Crim. App. 2009); *Bin Fang v. State*, 544 S.W.3d 923, 928 (Tex. App.—Houston [14th Dist.] 2018, no pet.). Lack of DNA or fingerprint evidence does not affect the sufficiency of the proof. *Pena v. State*, 441 S.W.3d 635, 641 (Tex. App.—Houston [1st Dist.] 2014, pet. ref'd). And it is well-settled that the testimony of a sole witness to an offense may constitute sufficient evidence to support a conviction. *Aguilar v. State*, 468 S.W.2d 75, 77 (Tex. Crim. App. 1971); *Johnson v. State*, 176 S.W.3d 74, 77 (Tex. App.—Houston [1st Dist.] 2004, pet. ref'd).

Here, both Velasquez, the victim from the MetroPCS robbery, and Jefferson, one of the victims from the 7-Eleven robbery, testified that they had picked Hobdy's picture from a photo lineup days after the robberies. And both Velasquez and

Jefferson identified Hobdy in court as the robber. Further, the jury heard, both through Velasquez's testimony and her 911 call, that the robber had either a scar or mole on his face, and Hobdy testified about a distinctive scar on his face. This testimony alone could constitute sufficient evidence that Hobdy was the robber in those two robberies. *See Aguilar*, 468 S.W.2d at 77 ("We conclude that the testimony of the eye witness alone was sufficient to support the jury's verdict.").

But the State put on more evidence of Hobdy's identity than just Velasquez's and Jefferson's testimony. Indeed, the State presented in-store surveillance video from the Fielder Road Cato, GameStop, MetroPCS, and 7-Eleven robberies. And at one point in the trial, the State focused the jury's attention toward a segment in the MetroPCS video wherein the robber looked almost directly at the camera as he entered the store. The State also introduced Kline's bulletin which contained a still shot of the robber from the 7-Eleven robbery. A rational factfinder could have concluded that Hobdy, who the jury saw in open court throughout the course of trial, was the same person they saw in the images of the robber that the State introduced. *See Smith v. State*, 421 S.W.3d 161, 165 (Tex. App.—San Antonio 2013, no pet.) (reasoning that the jury could have concluded defendant was the perpetrator based partly on the fact that the State had introduced images from surveillance video showing perpetrator of aggravated robbery).

Additionally, the jury could have considered Hobdy's inconsistent stories to Cussnick about how long he had lived in Louisiana, as well as his inconsistent and

22

nonresponsive statements made at trial about how long he had lived there, as evidence of a consciousness of guilt that he was the perpetrator of these robberies. *See Ross v. State*, 154 S.W.3d 804, 812 (Tex. App.—Houston [14th Dist.] 2004, pet. ref'd) (reasoning that defendant's statements to police on videotape which contradicted other evidence at trial were relevant and admissible to show his consciousness of guilt). The jury also could have reasonably inferred from Hobdy's reaction to Kline's bulletin that Hobdy was "insult[ed]" to be described as a "man dressed as a woman" and that Hobdy considered the bulletin's description as an afront to him because he considered the flier to be about him. *See Jackson*, 443 U.S. at 319, 99 S. Ct. at 2789; *Queeman*, 520 S.W.3d at 622. This inference is further reasonable given that Hobdy testified that he becomes upset when he is not acknowledged as being female.

Hobdy argues that the evidence presented at trial about his physical characteristics is inconsistent with his own physical characteristics. He also points out that not every witness testified to the robber's same height, weight, voice, and skin color and that some of the witnesses reported or testified inconsistently by their own statements. While it is true that some witnesses' recollections of the robber differed from other witnesses' recollections and while it is true that some witnesses reported different descriptions from the ones they ultimately testified to, the resolution of these perceived inconsistencies is the province of the jury and we must presume that the jury resolved the inconsistencies in favor of its finding that Hobdy was the robber. *See Murray*, 457 S.W.3d at 448–49 (reasoning that it is the factfinder's role to resolve

23

any conflicting inferences in favor of the verdict and that as a reviewing court we must defer to that resolution); *see also Jones v. State*, 984 S.W.2d 254, 258 (Tex. Crim. App. 1998) (reasoning that the factfinder is free to believe or disbelieve any part or all of a witness's testimony).

Viewing all the evidence of Hobdy's identity in the light most favorable to the jury's verdict, we hold that a rational factfinder could have found that the State proved beyond a reasonable doubt that Hobdy is the person who committed the robberies. *See Bradley*, 359 S.W.3d at 916; *see also Jackson*, 443 U.S. at 319, 99 S. Ct. at 2789. We overrule Hobdy's sole issue.

## IV. CONCLUSION

Having overruled Hobdy's sole issue on appeal, we affirm the trial court's judgments.

/s/ Dana Womack

Dana Womack
Justice

Do Not Publish
Tex. R. App. P. 47.2(b)

Delivered: August 8, 2019

24